Secretary, Department of Housing and Urban Development, Mr. Wagner for the appellant and Mr. Kolsky for the appellate. Good morning, Your Honor. Charles Wagner on behalf of the appellant. I would like to reserve five minutes of my time for rebuttal. We would submit that the district court's ruling should be reversed because the district court found that because Ms. Carter indicated that the notice of proposed removal indicated that she had missed 1,800 hours of leave per se, forced her out of the court, that she had pleaded herself out of court basically by alleging that 1,800 hours of leave had been used. The same paragraph that cited the 1,800 hours indicated that the majority of those hours were related to her medical disabilities. For that reason, we would submit that the district court was required to weigh the medical issues in its assessment of the 1,800 hours. She was frequently absent. Yes, she was frequently absent and the record shows that the majority of the time that she was absent pertained to her medical disabilities. She stated her medical disabilities at least in two places in her complaint. But frequent absence, black letter law, is that a disability causing frequent absences from work may render an employee unqualified when attendance is an essential function of the job. And here, attendance is an essential function of the job, so the frequent absences would seem not to render her qualified for the job. Well, Your Honor, what we would submit is that when you discuss or weigh frequent absences, in the context of the Rehabilitation Act, you must also take into account whether or not reasonable accommodation would have addressed that problem. Now, in paragraph 21 of her complaint, and we invite the court's attention to paragraph 21, in paragraph 21, she said that because her ailments impacted on her leave, she requested a reasonable accommodation. The law, as well as the union agency agreement, provided for a modified schedule as a reasonable accommodation, and that is what she sought. She said, look here, I'd like to come in a little later, and her doctor… The 1800 hours per week, I mean the work hours, that the district court relied on, according to paragraph 44, were since 2010. Is that right? That's all that's in the complaint about the time that she wasn't present. Well, Your Honor, the 1800 hours spanned a three-year period. Beginning… Beginning in 2010. Right. I'm not trying to trick you here, I promise. Okay. And in paragraph 22, it says her authorization to come over was discontinued in 2010, right? Yes. So, those hours in which she missed work were when she was no longer allowed to do her work by teleworking. Your Honor, the 1800 hours included time in 2010. Right. But her problems were triggered by the monitoring of her leave by Mr. Andrews. And when she began to experience problems on time of attendance, she asked for a reasonable accommodation, as we set forth in paragraph 21. And one of the things that she alleged was that because her ailments impacted on her time in attendance, she was disabled within… I'm sorry. But it's still 1800 hours over three years, right? You don't dispute the total number of absences, correct? I didn't quite… She was absent for 1800 hours over three years. It's about 600 hours a year, probably about a third of time for a normal working job. Your Honor, one of the things that we did was we challenged the hours, first of all. And we noted that only 116 hours were AWOL, were not authorized leave. So let's talk about that. But you don't challenge that the total is 1800, as I understand it, right? You say that some of them were because of medical conditions. Some of them were approved leave and such. Well, Your Honor, one of the things that we assert is that much of the leave was approved leave. And for that reason, the approved leave could not be used for disciplinary actions. If we're talking about 600 hours a year, how many of those are likely to be annual leave or sick leave? It seems to me it's got to be a pretty small percentage. Well, the problem, Your Honor, is this. The law is quite clear that you cannot use approved leave for disciplinary purposes. And if you take into account the full 1800 hours, which the law court did, it was using approved leave. And I'm inclined to agree with you on that, and I'm going to ask your colleague about that. But it still seems like whatever fraction of 600 hours a year is approved is a pretty small number. My experience in the government is you don't get 200 hours or 300 hours of sick leave or annual leave. Well, Your Honor, one of the things that the Federal Circuit has held, and I don't want me to suggest that somehow they trump the D.C. Circuit, but the Federal Circuit has held that where there is an issue under the Rehabilitation Act where the leave pertains to a disability, what have you, when you weigh the disciplinary action, you must also take into account the reason for the leave, and that that must be weighed when you say the 1800 hours was somehow bad. Now, we would submit that if the district court had said she missed 1800 hours and, yes, while part of the 1800 hours pertained to her illness, I still ruled that 1800 hours were too much. If we had that scenario we would submit, then we would have a different case here. But we don't have that situation or scenario because the lower court held that 1800 hours per se, without more. Ms. Carter pleaded herself out of court. Well, it's de novo review, though, on the dismissal, isn't it? That is correct, Your Honor, but we would also submit that even under de novo review before this court, this court must take into account the fact that the 1800 hours pertain to her medical disabilities, which was also, we would note, mentioned in the same paragraph that the 1800 hours were set forth, so that what we have here is 1800 hours impacted by the medical disabilities. Suppose all of the 1800 hours were because of a medical issue. Wouldn't that still render her unqualified if she has to miss 600 hours a year, even if for a medical reason? No, Your Honor, it wouldn't. If you had a full 1800 hours, the court was required to weigh the medical disabilities under the Rehabilitation Act. You just cannot write out of the conversation the Rehabilitation Act and say, well, 1800 hours, oh, well, that is per se bad, which is what the district court did. It says 1800 hours in the- But if attendance is part of the job, which it isn't for some jobs, it is for other jobs, but if attendance is part of the job and you can't be there because of your, as Judge Katzler says, because of your medical issues, that still means under the settled law that you're not qualified for the position, correct? No, Your Honor, not in this case, because what was sought here was a reasonable accommodation, and the question that this court must ask itself is whether or not the reasonable accommodation that she sought would have solved the problem. She did not ask to be off any time her illness bothered her. What she asked for and what her doctor suggested was that she be allowed to report late so many days a month. That was the request that she asked for. After the core hours of 730 to 930, but I didn't see anything saying how late and how often and whether she would make up for that working other time as happened in one of the cases. Well, Your Honor, she asked for a flexible schedule, and 730 to 930 were her normal working hours. Consequently, as her doctor suggested that she be allowed to report late so many days a month, what have you, if they had accommodated that, if there was something in the record that says, yes, you can show up beyond 930 on so many days a month, what have you, that would have solved the problem. One of the things that we invite the court's attention to is that in the specifications, Well, if I might impose on the court, sir, one of the things that Ms. Carter did was she challenged the hours. She said that those 1800 hours were worth it. Before we get into this, I just want to be sure I understand the position you stated before. The position is that had she been granted a reasonable accommodation, she would not have missed work in the same amount that she did have to miss it because she didn't have one, right? That is correct, Your Honor. And with respect to Judge Kavanaugh's question to you, which said, if attendance during regular hours were required, being absent this much would be a problem, is your position that in order to get the job done, she could have gotten it done with the accommodation, and it was not required by the essence of the job that she be there at that earlier time? That is correct, Your Honor. One of the things that we would note is that prior to Mr. Andrews serving as her supervisor, Ms. Carter never had any problems. Just to point out the time, you better address the exhaustion question. Pardon me? The exhaustion question for your mother. Yes. The law court said that Ms. Carter did not exhaust her administrative remedies and that she filed a grievance first and then the EEO, and that by filing the grievance first, it precluded her filing the EEO action. But we noted that the grievance pertained to the performance improvement plan as well as her performance appraisal. Mr. Andrews denied the grievance because it was not covered by the collective bargaining agreement. Can I just ask to clarify something I'm thinking about here? On the retaliation claim, that is the claim that you were fired, that she was fired in retaliation for her EEO activity, correct? Yes. So when she is terminated, the union immediately elects arbitration, correct? Yes. Did she ever raise to the arbitrator a retaliation argument of any kind? Yes, she did, Your Honor. I invite the court's attention to this. Where is that? Page 181 of Mr. Andrews' testimony. In fact, from page 178. Which tab are you? The second transcript. It's transcript number two. I invite the court's attention to this. It's at the back of the attendees. 178 to 181. And specifically, we invite the court's attention to page 181, paragraphs 1 through 181. Your Honor, you're talking about the pagination of the appendix? Yes. Okay. And at that point, from 1 through 14. This is the question that begins, so the vast majority of the leave was cited in the notice of proposed removal. No, Your Honor. It begins, arbitrator Sharnoff, okay, I mean, I'm assuming that you're going to place that into the record. You did read from it. We're not finding it, sir. It's not on the page we thought we were on. Do you know which? Is it tab W? It's transcript number two. It's tab transcript number two. Which tab, Your Honor? It's the last tab. And it's page 181. Of the transcript page. Of the transcript, yes. One of the things that happened was the agency called Mr. Andrews to the stand. Now, at the start of the proceeding, there was a discussion regarding whether or not the arbitrator could hear anything related to the EEO claims because those claims were pending before the EEOC. What happened at that point was we recognized that there was a proceeding before the EEOC and we recognized that there might be a problem. However, when Mr. Andrews was called as a witness, we argued starting on 178-81, the most pertinent pages, we said, wait a moment. They have waived any claim that those proceedings should be kept separate and apart from the arbitration because Mr. Andrews was called as a witness. Counsel, I'm sorry. I'm looking at this and it seems to confirm what the MSPB held and what the EEOC held, which is that you did not challenge the removal as retaliatory because on the middle of this page, you are saying retaliation is not the issue in this proceeding. Well, you know, specifically we state that we take that your ruling is that retaliation, so that it was raised at that point. And it was later raised that from 178 to 181, we talk about retaliation and it was our argument then that because the arbitrator refused to consider any retaliation-based challenge to the removal. And you say we understand your ruling. And then you tried to inject retaliation into the MSPB appeal and they said no, and you tried to inject it into the EEOC appeal and they said no. Yes. So you haven't challenged retaliation in the arbitration and you did challenge retaliation in the EEO complaint, but you expressly limited that challenge to the notice of proposed removal. Well, Your Honor, one of the things, as I indicated, we start at page 178 and go to 181. Okay. And one of the things that we argued was that the retaliation claim was now before the arbitrator because that issue had been waived, the separation of the two proceedings had been waived by the calling of Mr. Andrews. And because Mr. Andrews had been called, we said that all the issues before EEOC were now before the arbitrator and we asked that. Fine, but the issue before the EEOC was a challenge to the proposed removal. Yes. And while one might think in the abstract that a challenge to a proposed removal encompasses a challenge to the later removal, you explicitly carved that out. When you put retaliation into the EEO proceeding, you said you only wanted to challenge the proposal and you explicitly did not challenge any ensuing removal. Well, Your Honor, one of the things that occurs with regard to EEO claims, any claim that is filed will encompass any related claims that follow on the heels of that claim. And so I'm not sure that's right after Amtrak, but in any event, I'm just looking at your own. This is your letter to the EEOC injecting retaliation into the case, and you say you want to challenge the notice of proposed removal, and then you say this proposal is a standalone action, is what you want to challenge without including the subsequent action that may result from the proposal. The proposed removal not including the removal, that's your formulation. Well, Your Honor, one of the things that we cite the Ninth Circuit case, and the related cases would say that anything that follows on the heels of the initial action, if it's related, is automatically covered. But more importantly, Your Honor, one of the things that happened is we did raise the, as a result of what happened on pages 1, 7, 8, and 1, we did raise the matter before the arbitrator. We did thereafter raise the matter before the MSPD. We then raised the matter before. Can I ask one other clarifying question? Because the arbitrator on 179 at the bottom says, it appears that the retaliation as to the proposal is in the EEO channel, but then says if you have a retaliation claim that is separate and apart from that and can so demonstrate, you're welcome to go down that path at that point. And I thought that I read that to be the arbitrator distinguishing the proposed removal from the removal. Well, Your Honor, one of the things that we were arguing at that point was because Mr. Andrews testified at the arbitration, his actions were automatically injected into the case. And for that reason, retaliation was before the arbitrator. But more importantly, the exhaustion requirement is not jurisdictional for this court. What is important is that the matter is raised. And we raised it. The case was dismissed by EEOC because they said, well, it's a mixed case. We're kicking it over. But unfortunately, that occurred after the record was closed in the arbitration. We would submit that the matter was placed before the arbitrator as a result of the discussion from page 178 to 181. Once that was done, we then raised the same matter before the MSPB. We said, look here. Andrews was called as a witness. The matter was injected. He should have ruled on it. MSPB said, no, he didn't decide it, and so whatever. And the same thing happened with EEOC. I'm sorry. I'm not understanding the significance of Andrews' testimony. Your theory is that Andrews is called as a witness in the arbitration and testifies about the motive for the final removal, and that somehow puts retaliation with regard to the final removal at issue? I just want to understand. Yes. What we are asserting, Your Honor, is this, that by virtue of the fact that Mr. Andrews was called in the arbitration, all of his actions were then placed in issue. And if his actions were retaliatory, then those actions were also automatically placed in issue before the arbitration, and we sought to litigate those issues before the arbitrator. The arbitrator said no, and so we went to the MSPB and then to the EEOC. The important thing, Your Honor, is that we did not pass up the MSPB and the EEOC as appealing that issue. No, I understand. We then appealed to the MSPB and then the EEOC, and for the exhaustion purposes, it is not necessary, we would submit, for the MSPB to address any issues or for the EEOC to address the issues, because after 180 days, the plaintiff automatically has the right to go to the next level. So that it doesn't matter whether the EEOC or the MSPB actually addressed the issues. 180 days kicks in and you go to the next level. The main thing is that Ms. Carter did go to those forums and asked those forums to consider it. And for that reason, the argument that the district court said, hey, she started down this road on grievance, she was precluded from going anywhere else, it didn't matter because she did go to those forums. Also, Your Honor, we would submit that at the arbitration, HUD took the position that those issues could not be brought in, brought before the arbitration because they were before EEOC. So that what you had was a scenario where they're saying one thing in this forum that is different from what they said in the other forum. But by virtue of having gone to those forums. I think I understand. Could I just ask you one question about the hostile environment claim? What is the impermissible basis of hostile environment? Is it disability or race? Well, Your Honor, as we indicated, we dismissed the racial discrimination claim. So presumably it has to be disability. It's disability and retaliation in a hostile work environment. So if we affirm the dismissal of your Rehabilitation Act claims, what is left of the hostile environment claim? It would seem that assuming we affirm on the first point, you haven't adequately pled that the specific things that happened to your client were disability-based. And so what the record would show is that the supervisor is just being mean and difficult. But that's not a hostile environment unless it's linked to the disability. So how can you have a hostile environment claim without any disability-based discrimination? One of the things that remains, irrespective of how this court treats the Rehabilitation Act claims, because Mr. Andrews is the supervisor, as we point out in our reply brief, his actions must be weighed as a supervisor as opposed to a regular employee. But it's not illegal for him to create a very, very hostile environment unless it's a hostile environment based on race or disability or sex or another prohibited criteria. Your Honor, whether or not Ms. Carter stated a proper Rehabilitation Act claim, the fact remains that Mr. Andrews utilized his position to, as soon as she filed her grievance, the next day he hit her with a rubber band. After she asserted that he had improperly denied her leave in January, December, what have you, he extended her leave restrictions. So the improper motive is that it's retaliatory? Yes. His goal, we submit, is that his goal was to remove Ms. Carter from her position. So let's assume then that we affirm on the retaliation claim on exhaustion grounds, and as a result you can't litigate in court the question whether any of the individual acts was retaliatory. Same question. How do you then show a hostile environment comprised of individual acts that in order to be illegal have to be retaliatory? Well, Your Honor, one of the things that we have here is that on the 19th of September she files the grievance. On the 20th of September he issues the reprimand. The reprimand is based on acts that occurred three weeks earlier. She files another retaliation claim in January because of his extension of the leave restriction. Then finally we have the EEO claim that after he went through the process of removing her for annual leave or leave purposes he decided that he was going to remove her. But we assert that that action began after he was notified on October the 26th that she had filed an EEO claim so that in the wake of every action that she took against Ms. Andrews there was a counter action. Mr. Wagner, we're sort of way over. I want to sum up. Well, Your Honor, we would submit that the trial court by stating that 1,800 hours per se really basically kicked Ms. Accord out of court. The failure of the trial court to weigh her disabilities in making that decision we would submit was a reversible error. And as far as the exhaustion, we would submit that by having dotted all the I's and crossed all the T's by going to the various agencies, what have you, irrespective of how they ruled, what have you, she did everything that was required of her to exhaust her administrative limits. Thank you, Your Honor. Good morning. Josh Kolsky on behalf of the FLE. In this case, the agency identified specific feeding deficiencies in Ms. Carter's initial... Did she begin with the 1,800 hours point? Yes. Is the government going to stand on that argument? We do believe that that establishes that she was not qualified to perform the essential functions of her job. However... Why do you say that? Because the... Which case of ours do you rely on for that proposition? Well, it would be DOAC v. Johnson. Michelle? I thought it was Carr was the case you were relying on. Is that wrong? Well, both of those. I mean, our argument is... Our primary argument, Your Honor, is that the complaint doesn't allege facts to show that she was qualified. And the court doesn't even have to get into... Yeah, I know the court doesn't have to get into it, but I want to be sure that the government... what the government's position is. Do you think that when you plead that you were... that she was... had missed 1,800 hours, that that per se means that she's plead herself out of court? Where there is no allegation that attendance was not an essential function of her job? Well, who has to make that allegation? So she says in exactly the same paragraph... or not in the same paragraph. She says the removal decision noted that Ms. Carter had missed 1,800 hours since 2010. But she also alleges that her authorization to telework was discontinued in 2010. And she also says that she asked as an accommodation to telework. So all we have on the face of the complaint is that she was not able to do the job after her accommodation had been eliminated. And she alleges with an accommodation she would have been able to do her job. Now, the other facts which are at issue here is, is attendance really essential or not? None of that's in the complaint either way. That's correct. And that's our position, that she would need to allege something about the nature of her job responsibilities and an allegation that she could perform those job responsibilities. She alleged that with an accommodation she could perform her job. Why isn't that enough at this stage of the complaint? Your Honor, I don't believe she did allege that. She alleged that she could maintain an acceptable work schedule. That's paragraph 50. But that's not the same as performing one's essential job functions. And I think that is the distinction in the Doack v. Johnson case where the plaintiff requested delayed start time and the court held that even with that accommodation, the employee wouldn't be able to perform the essential functions of her job, which required attendance in the office during ordinary business hours. Paragraph 50 says that it would enable her to maintain an acceptable work schedule. I know you're interpreting that as not being enough, but this is only a complaint here. This is not summary judgment even. You did ask for summary judgment. The judge didn't grant you that. Well, we asked for summary judgment in the alternative on the exhaustion issue. Do you agree that telework, which enables you to do your job, would be an accommodation? I'm not saying in this case, but as a general matter, even if you could not attend work but you could do your job with telework, that that would be sufficient? I just want to make sure I understand Your Honor correctly. If telework enabled a person to perform the essential functions of their job, that could be a reasonable accommodation. And so the mere fact that someone wasn't able to do their job without telework doesn't mean that they weren't able to do the essential functions of their job. That is correct. By telework, you mean working from home? Right. And you think it could be a reasonable accommodation regardless of the number of hours? Well, it would depend on the fact. It would depend on the job responsibilities. Now, all this depends on the job, right? That's correct. Chief Judge Garland's questions, I think, depend on the nature of the job. They all seem to me to be facts that you normally don't dismiss on the basis of the complaint alone. But there still needs to be facts in the complaint to plausibly suggest that she could perform the essential functions of her job. And there's no indication of what was she doing. Did she need to actually be in the office during core business hours? And, in fact, the notice of proposed removal, which is referenced in the complaint, gets at this idea. Her supervisor indicated that the nature of her work was time sensitive and she needed to be in the office. Now, that's not alleged in the complaint. And my understanding of this case, not based on the facts of the complaint, but is that it was necessary for her to be in the office during ordinary business hours. But now we're beyond the complaint. I'm sorry? But now we're beyond the complaint. Right. And my position is that a plaintiff shouldn't be able to omit facts pertaining to an element of their claim in order to essentially hide a critical deficiency that is only going to be revealed during discovery. If the complaint said, without anything more, this job does not require physical presence at the workplace but can be performed by telework, would that be enough to survive a motion to dismiss? I think that there would need to be some factual support for that, some description of what her duties were so that the court could infer. Isn't that where summary judgment usually kicks in, not a motion to dismiss? Well, I think under Twombly and Iqbal, there does need to be a factual basis. It's difficult to say in the abstract exactly how much factual support is necessary. But even the allegation that you have... Yeah, your point is that there's no allegation like that in this complaint. That's correct. I was just exploring what would be necessary under either. Our position is that there needs to be some factual support for the court to draw the conclusion that she could perform the essential functions of her job. Could I take you back to the 1,800 hours? Yes. That does strike me as a very large number, but I am troubled by what I understand to be the government's position that an employee can be deemed disqualified by taking even leave that is approved in some sense, annual leave, sick leave, whatever it is. So is that your position? I believe there is support for the idea that a person can be removed even if the leave is approved. I would think if the governing statutes or regulations say, look, you come work for us, you're entitled to X number of hours of annual leave and Y number of hours of sick leave or whatever, that's an authoritative statement that that amount of absenteeism doesn't count against an employee. It's part of the employee's rights as part of the employment arrangement. Well, I think a lot of the leave here was leave without pay. Right. So it seems to me the categories that really shouldn't count against an employee are annual leave and sick leave. On the other end of the spectrum, the categories that clearly should are AWOL. And then leave without pay seems to me in the middle, and I'm not sure what it is. So could you just elaborate on what it is and why you think it can count against an employee in the way that you suggest? I mean, the record isn't entirely clear on the nature of the leave, the different types of leave that we started to use here. My understanding is that she was absent frequently. In some cases, the agency exercises discretion to allow her to take leave without pay rather than to designate her as AWOL. I assume that just means she's used up her annual leave, she's used up her sick leave, she has a medical issue, she doesn't come in, and the agency says, okay, but we're not going to pay you for that time. That's my understanding as well. How much annual and sick leave did she have at this time in this period? I'm not sure. The Notice of Proposed Removal discusses – it breaks down her leave in terms of annual leave. It notes that in 2011, there was 205 hours of annual leave, 105 hours of sick leave, 377 hours of leave without pay. I'm not sure what her annual allocation of annual leave and sick leave was. But I think the idea is that – I would think it's a pretty small number relative to 1,800 hours, but this does tend to buttress the Chief's point that we can only do so much on a motion to dismiss. Right. And I think the idea is that to the extent that the agency was exercising its discretion to show some leniency and not designate these hours as AWOL, that doesn't mean that Ms. Carter was performing her essential job function, and it doesn't mean that the agency had to continue being lenient in the future. The absences demonstrated an inability to perform her job functions. Can we talk about the exhaustion? Yes, sir. I must say I'm a little confused by it. There are a lot of – Maybe exhausted? I'm sorry? Maybe I'm a little exhausted by it? There are a lot of moving parts with the exhaustion issue. So the only issues that matter with respect to exhaustion are hostile work environment and retaliation? Yes, sir. Okay. So can you tell me why she didn't exhaust on the retaliation argument? The retaliation challenges her for removal. When she received the notice of proposed removal, she filed an EO claim on that, and she specifically carved out the later action that might result from that. That's in that grievance that was just being read before. It's not in the – does the EO complaint say that I'm not going to include the – Yes, the EO complaint is attached as an addendum to the government's brief, and – What's the date of it? I'm sorry. You're asking for the date? Yes. That's July 19th, 2011. It's dated November 21st, 2011. But the point at which she injects retaliation into the EO complaint based on the proposed removal, as I understand it, is the July 19, 2012 document. Yes, yes. So – It hadn't been removed, but the notice hadn't even been issued. I'm sorry. Her EO complaint was the November document. The amendment to the EO complaint came later. Which is the thing that you thought that carved out? That is the appendix, page 279. What's the date of it? That is July 19, 2012. And it's at the end of the first paragraph. She writes, It is my understanding that I can submit this proposal as a stand-alone action of reprisal without including the subsequent action that may result from the proposal. And, in fact, when the actual removal occurred, she went to the negotiating grievance procedure. She invoked arbitration as to the removal and did not raise a retaliation claim. I'm sorry. I'm going to have to make you keep toggling back and forth. Tell me again in the appendix where it is. The appendix, page 279. It's on it. I was going to think it was on it. Yeah. And it's at the end of the first paragraph. Yeah. Yeah. So she specifically carved out the – At least for that moment. That's correct. She didn't necessarily decide. She couldn't. It's just she can't. Right. But she never went back and amended the EEO complaint to include the actual removal. What happened October 2nd of 2012? October. Is that the notice to invoke arbitration? That was September 24th. The arbitration invocation. This was sort of an updating of the complaint on October 2nd. I don't have a – It's an investigative act to David. It's a question of how I find it now in the appendix. But it's dated October 2nd. It's – 2012. Yeah, 2012. I don't have that one. Great. It's in addendum A to her – Okay. Right. So this is an investigative affidavit. And it repeatedly asks about the proposed removal, paragraphs 13, 14, 15, 16, 17. So this just reflects that the agency was investigating the EEO complaint about the proposed removal. But it is undisputed that when she was removed, she invoked arbitration, proceeded through arbitration, appealed that to the MSPB, appealed that to the EEOC, but never raised a retaliation claim in that process. And I know Mr. Wagner discussed some pages from the transcript this morning. I don't believe those were cited in the briefing, so I haven't focused on them. But I did notice that page 177 seems to indicate that retaliation was not raised. It says, Mr. Wagner, that is the proposal to remove. Now the actual removal is not. We're not alleging or asserting retaliation in connection with Mr. Boyd's decision. Retaliation actually is against Mr. Andrews. Mr. Boyd's actions are separate. We have not asserted retaliation as an issue before this body. And just to clarify, Mr. Boyd was the deciding official on the removal. Mr. Andrews was the proposing official. So what seems to be indicated here is that retaliation was raised as to Mr. Andrews, as to the notice of proposed removal, and that was in the EEO process. As to Mr. Boyd's decision, the removal, which was challenged through arbitration, retaliation was not raised. And therefore, that claim was not exhausted. What about the other? She made a retaliation claim about other things as well. You're saying those were all done through the grievance? She made a retaliation claim about her September 20th EEOC complaint, alleges disability discrimination, hostile work environment, and retaliation for whatever happened before that. So what about that? Is that exhausting? Well, the retaliation claim that's in federal court is based on the removal. Only a removal? That's count free, right? That's only the removal? Yes. I think. That's right. It doesn't identify any other actions that allegedly were retaliatory. So our position is that she elected the grievance procedure as her remedy for the removal, didn't raise a retaliation claim, and therefore that claim is unexhausted. Then with respect to the removal, what happened after she invoked it with respect to removal? The process proceeded to arbitration. There was a multi-day arbitration. The arbitrator ruled against her on various issues relating to the removal. She appealed that to the MSPB. And at that point, she tried to raise the retaliation claim. And the MSPB said, you didn't raise that in the arbitration. We're not going to consider it. Let me just back up. In what way did she not exhaust the grievance process? She did exhaust the grievance process as to the removal. Would she? Yeah. So there were sort of two grievance processes. There was the initial grievance process in September of 2011, and that relates to the hostile work environment claim. There was another grievance process relating to the removal. Yeah, I got to do one at a time. Right. So with respect to the removal, she invoked arbitration with respect to the removal. The arbitrator, what, denied it? That's correct. And then? And then she appealed to the MSPB and then appealed to the EEOC. So we're not contending that she didn't exhaust whatever claims she had raised in that process. It's a removal process. Right. And the problem is that it didn't specifically say reprisal. It just said, I'm complaining about removal. Right. Well, there were particular issues that were raised in the arbitration, and one of them was not retaliation. In fact, as the transcript seems to indicate, she specifically said she was. And then when she applied to the MSPB, she did raise the reprisal issue? Yes, she attempted to. And they dismissed it for the reason that she hadn't raised it? Raised it before the arbitrator. Right. So that's a procedural ground for dismissing it. That's correct. So why isn't the Supreme Court's Kleckner case, which says that when the MSPB rejects either on procedural or merits grounds, that's a final decision? And then you can sue in federal court. Why isn't this exhausting enough? That is, maybe she made a mistake, maybe she erred, but she kept going, and she went to the highest place she could go in the administration, and she lost. Well, I mean, she needed to include the claim. Well, she did include it in the MSPB. And at that point it was too late. At that point it was rejected. But is there a case or anything that says that, in other words, where you do finally raise the issue with the MSPB and you erred somewhere along the way, that that doesn't count as exhaustion? I understand why the MSPB might be completely right, but why isn't it enough for exhaustion? Is there a case that says that? I don't know of a particular case. That issue was not raised by the appellant. Well, he is raising that. That's where he says, look, we went everywhere we could. We applied to the MSPB, we applied to this, we applied to that. The point of exhaustion is to get notice. You got plenty of notice, not you personally. The agency, they were involved in all these proceedings, so they knew what was going on. The purpose of exhaustion is the agency wants to fix something in advance of going to court. They can. They had several fronts on which they could have done it. Well, I think to allow employees to exhaust that way would allow them to bypass the process and raise issues that had not been fleshed out early on in the process. It's clear that he'd lose on the merits, and that would still be exhaustion, right? It doesn't matter. The MSPB can't bind the court in a case brought under the statute, right? I agree. So, what's the difference? That is, they lose on the merits, they lose on the merits. If they lose because they screwed up the procedure, they lose on that. They put forward their arguments. The government had an opportunity to fix them if it wanted to, which obviously didn't want to because it thought it was right on the merits. So... I think the arbitration is a process that's a lot more amenable to figuring out the facts, much more so than before the MSPB. Is the proceeding an evidentiary proceeding or an appellate proceeding on the arbitration record? My understanding is it's more like an appellate proceeding. The arbitration proceedings, there's witnesses, there's evidence submitted. And when the MSPB issued its ruling that because she could have but did not raise her retaliation claim during the arbitration, she's therefore precluded from asserting it before the board, it cites CFR 1201, 155C, and a bunch of cases. What are those? I didn't go back and check them because I didn't understand your opponent to be making this argument. But what does that authority say?  Okay. Thank you. If you look with me on tab K, page 84, this is the EEOC order of dismissal? Yes. In the last full sentence on the page, the plaintiff must be provided written notification of her right to file either a mixed case complaint or a mixed case appeal regarding the harassment slash removal claims. Does that sound like the EEOC thought that she had? She made a mixed case on the removal claim? I think the reference to removal there is referring to the proposed removal, which she had raised in the EEOC. Can I ask you about that dismissal? I don't understand it. As I understand the way the scheme works, whatever was in the EEO track should have gone forward as against the later arbitration because the EEO complaint was filed before the arbitration was filed. So why is the EEOC dismissing that proceeding in deference to a later filed arbitration? It's not clear. The EEOC, as you'll see, the order of dismissal is very short. I'm not sure it matters, but I just didn't understand what they were doing. There isn't much of an explanation here. My understanding is that they were aware that the other proceeding was going on and seemed to think that that should play itself out and that there shouldn't be the two proceedings occurring simultaneously, but there certainly isn't a lot of explanation in the order of dismissal. Are you helping with the hospital work environment? Yes. Go ahead. Ms. Carter filed a grievance on September 19, 2011, addressing various issues relating to performance appraisals, performance standards. The grievance was denied as to two of those actions, and one of them the supervisor agreed to meet with Ms. Carter to discuss her performance standards. She didn't further pursue the grievance past step one. Are we talking about the grievance now or the... The grievance. Where was the hospital work environment raised? She did not raise the hospital work environment there. In the grievance? In the grievance. But she did on September 20 with the EEO complaint. The next day, September 20, she went to an EEO counselor and started that process, and then in November, she submitted a formal EEO complaint, which did raise the hospital work environment claim based on the same issues. She also included additional issues. Based on the same issues as? As the grievance. The grievance was just about the PIP and the midyear evaluation. It was about the PIP, the midyear evaluation, and her supervisor's failure to discuss her performance standards with her. Those were the three issues. Those same issues were addressed in the EEO complaint along with additional issues as well. So our position is that, as with the removal, she elected, here she elected the negotiated grievance procedure to address these actions. Even though she didn't raise hospital work environment at all? That's correct. It's not a question of raising a particular claim. You elect a remedy for a matter, and then once you've elected that remedy, you have to raise whatever claims you believe apply. And here, she did not raise a hospital work environment claim in her elected remedy, in the negotiated grievance procedure. And it's clearly the same matter, the same actions that occurred at the same time. She filed the grievance on September 19, started the EEO process the next day. She was complaining about the same issues. So she didn't raise the hospital work environment claim in the negotiated grievance procedure. She also didn't pursue it past step one. To exhaust that procedure, she would have... Which procedure are you talking about? Negotiated grievance procedure. To exhaust through that process, she would have had to appeal to step two, then to step three, and then to arbitration. What about the notice of proposed removal and the removal decision? Those were addressed... Well, the notice of proposed removal was included in the EEO complaint, and the removal was addressed through the arbitration. So what about the notice? That was raised in the EEO process. And is that exhausted? I'm not arguing that it wasn't exhausted, but she hasn't raised that issue in federal court. No, but I'm talking about as part of the hospital work environment. Because on July 19, it looked like she at least updated the notice, the complaint to include the notice of proposed removal. Is that wrong? No, that is correct. I think that... So in Morgan, which is the Amtrak case that Judge Katzus was talking about, the hospital work environment doesn't, even again if that case applies here, it's different than other cases because it's other issues, because it's a continuing series of violations. And as long as one of them is within the time, you can bring the whole thing, anything that happened during that time. So why isn't the notice of proposed... I keep thinking notice of proposed rulemaking. I apologize. That's for the next case, probably. But for this case, the notice of proposed removal, why isn't that, which then relates back to the complaint, why isn't that exhaustive with respect to the hospital work environment claim? Well, it's not clear that she is actually including that in her hospital work environment claim. She refers to the... Her hospital environment theory is just take all of the acts and lump them together, right? Everything from the pit that was the subject of the initial agreements to the ultimate removal, which is the subject of the arbitration, right? That's correct. All of these actions are treated together, and the first selection she made with regard to certain of those actions was the negotiated grievance procedure. Chief Judge Garland's point was that if at least one of those actions was exhausted, does that mean that her hospital work environment claim was exhausted? And therefore, you have to address the merits of it, and you have an alternative argument on the merits of it, I believe. We do. It's that it does not state a hospital work environment claim because it's nothing like your typical hospital work environment claim. That's correct. What about the idea that if one of, say there are five things, and one of them is exhausted and that's part of the hospital work environment, which I understood to be what was being gotten at, I'm not sure of the answer to that, Your Honor. I would have to go back and look at that. It seems like a stretch on exhaustion to say that the initial grievance, which focuses on all of the early discreet acts, covers everything, but I think that's because this feels like a discreet acts case rather than a hospital environment case. Normally we would treat, if you're challenging, you can challenge a removal, and you can challenge a reprimand, and you can maybe challenge a performance evaluation. Those are all what Morgan would characterize as discreet acts. It seems odd to me that you could stitch together a bunch of discreet acts into a hospital environment claim. I agree, and that gets to our argument in the alternative, that the acts that are alleged as alleged hostile acts are not. There is no cohesiveness to them. It is a collection of discreet acts, none of which are inherently hostile. These are ordinary workplace incidents. People get put on performance improvement plans. Is your argument, I guess the EEOC says that hostile conduct says it's not limited to this, but offensive jokes, slurs, epithets, physical assaults, intimidation, ridicule, mockery, insults, et cetera, things like that. That's not what's alleged here. That's right, and I think in a more traditional, sort of classic hostile work environment case where there's that sort of conduct, a complaint alleging those sorts of facts wouldn't have to go into maybe more detail because it's sort of inherently obvious why those actions are hostile. But here when you're talking about performance improvement plans, low performance appraisals, our position is there needs to be some factual basis for concluding that those were severe, that they were hostile, and there's nothing that on their face would suggest as much. And there's no factual validations to that effect here. There's nothing suggesting that these were particularly severe or pervasive. We've outlined in our brief the number of incidents. It's a relatively small number of incidents occurring over about a three-year time period. So we don't think that rises to the level of a hostile work environment. And also there's no indication of a protected characteristic that the allegedly hostile environment was predicated on. I know the issue of question of retaliation was posed to Mr. Wagner. Notably, the alleged hostile environment allegedly began in 2009, according to the complaint. There's no indication of any protected activity at that point. The first indication of protected activity is in 2011. So that would seem to undercut any inference that the hostile work environment was based on retaliation when there was no protected activity preceding it. All right. Thank you very much. Thank you. Does Mr. Wagner have any time? Okay. Well, we've let both sides go over, so I'll give you another two minutes. Please try and keep it at that. I'll try, Your Honor. Thank you. One of the things that we would submit is controlling here is that with respect to the 1800 hours, counsel mentioned something about performance. Performance is not an issue in this case. Time and attendance is the issue here. And in paragraph 21 of her complaint, Ms. Carter says, because my ailments impact on my attendance, I requested a reasonable accommodation. That is carried over in the portion of the complaint pertaining to the Rehabilitation Act claims. But more importantly, Your Honor, we would submit that where you have a claim that the 1800 hours is tied to a medical problem, you cannot say that because of 1800 hours per se that this lady is out of court, which is what the district court said. But doesn't the complaint need to say something to the effect of, I am qualified to perform this job, even though I can't be there quite often, because telework is sufficient to make me qualified to do the requirements of the job. And there's nothing like that in the complaint. Your Honor, one of the things that is clear here is that she was not under duress because of performance. She was not removed for performance. In fact, Mr. Andrews conceded that a performance was not a basis for her removal.  Now, if time and attendance is the only issue, then the question becomes whether or not a reasonable accommodation would have addressed that problem. Her doctor says, let her come in late sometimes. And that's what she sought. She sought a reasonable accommodation to come in late on occasion. One of the things about the specifications that are spelled out in the Notice of Proposed Removal is that, on three of the specifications, she was ruled AWOL for just 30 minutes. The restriction in her leave said, you can only get permission for tardiness if it is an emergency. Only under emergency situations can you get any kind of leeway for tardiness. When she said, I want to come in late, did she say how late would solve the problem but still be reasonable from the employer's point of view? She did not specify how late, but she said a flexible schedule. And what she had mentioned in her deposition is that she would like to come in after 930. If they had said, you can come in at 1030, that would have knocked out 10 of the specifications set forth in the Notice of Proposed Removal. One of the things that the other side conceded was that her total AWOL hours amounted to 116 hours. And we even challenged that, that those hours were really inflated. Now one thing, another thing, and I know I'm running over and I thank the court for its indulgence. On page 270-271, the EEOC advised Mrs. Carter that anything that follows her initial complaint that is related, they're not going to accept that as an additional claim. It was with that in mind that when she filed her retaliation claim on July the 19th, she understood that anything that followed that would be automatically included in their retaliation claim. But more importantly, on page, in the discussion, 178-181, she, of the Mr. Andrews testimony, Mrs. Carter said, hey, basically, because they called Mr. Andrews to testify about his actions, they have injected all of his conduct into this proceeding and we should be allowed to go into the retaliation claim here because Mr. Andrews testified about the things that he had done. It is on that basis that we asserted the retaliation claim in the arbitration. And finally, we're dealing with notice pleading here, and notice pleading doesn't require a whole lot. All we have to do is place them on notice of what the claim is. The agency was well aware of the claim because they went through a discovery at the EEOC. They deposed Mrs. Carter. They went through an arbitration proceeding. They had the filings before the MSPB, the EEOC. They knew before this case was filed in district court what this whole thing was all about. And one of the things was performance is not an issue here. The only issue is time and attendance. And we could have addressed that with a little leeway in terms of allowing her to arrive late. That is what our doctor said, and that is what she thought, and a little flexibility. And the question is, it doesn't matter what her hours were. If time and attendance could be addressed with... We need to let all the other people who are sitting back there. I think the court was indulgent. I'm sorry. It's okay. Thank you. We'll take the matter under submission.
judges: Garland, Kavanaugh, Katsas